On behalf of the appellate, Mr. Mark A. Byrd. On behalf of the appellate, Mr. Nathan Reyes. Good morning, Mr. Byrd. May it please the court, your honors, Mr. Reyes. Good morning, my name is Mark Byrd and I represent the appellant, Travis Guerin, in this morning's hearing. Mr. Guerin is before the court seeking an order either vacating a plenary two-year order of protection that was entered against him or the alternative, an order directing the circuit court in Winnebago County to vacate said order non-pro ton to the date of its issuance. In support of our position in this case, I'll be advancing essentially two arguments on Mr. Guerin's behalf. The first argument is that the entry of the two-year order of protection based upon the evidence in this case was contrary to the manifest weight of the evidence. The second argument is that the trial court failed to properly consider the defenses that were proffered by Mr. Guerin in that hearing. Essentially, defenses of personal property lawfully in his possession and defense of dwelling is recognized under the criminal code and incorporated into the Domestic Violence Act. The first argument that I'm advancing, your honors, is that the trial court decision granting the two-year order of protection against Mr. Guerin in this case was contrary to the manifest weight of the evidence. We know from the Illinois Supreme Court in the case of Best v. Best that this is a very exacting standard that we must overcome. Essentially, in order to obtain reversal or vacation of that order of protection, we must convince your honors that the opposite conclusion is clearly evident on this record or the finding itself is unreasonable, arbitrary, or not based on the evidence presented. That must also be read with the admonishment from Best and actually before Best that the trial court is in fact titled to a degree of deference in this case and that the court typically will not substitute its judgment on issues of credibility or the weight to be given the evidence. However, I respectfully submit that in this case and on this record, we are able to demonstrate, notwithstanding that degree of deference and notwithstanding the principle of not substituting credibility determinations for that given by the trial court, that the decision was in fact won, which on this record the opposite conclusion is clearly evident and the finding in a word of the two-year order of protection is unreasonable. This case does boil down to the issue of credibility and one of the reasons that I believe that we can meet this exacting standard on the facts in this record is the testimony of essentially the three witnesses in this case that testified in the hearing. That being the plaintiff, Chaplain Postas, Winnebago County Sheriff's Deputy Allen Adkins, who was the officer dispatched to the scene that day, and the testimony of the defendant himself. Numerous inconsistencies, material omissions, and material admissions were on the face of this record and presented to the trial court that day. We have a situation where the plaintiff, Ms. Postas, goes and obtains an emergency order of protection by filing a verified petition in which she alleges essentially two actions on the part of Mr. Guerin. First, that he pushed her into a wall. Second, that he pushed her into a door, knocking the door off of the hinges, and those are essentially the two items that are included in the petition, verified petition for order of protection. When Deputy Allen Adkins, the day before the petition for order of protection is obtained or filed, he comes to the scene and investigates. What's important to keep in mind about Deputy Adkins is that Deputy Adkins is a five-year veteran of the Winnebago County Sheriff's Department. He's highly trained, and his purpose in being there is, one, to remove the breach of the peace that has occurred, and second, he does in fact arrest Mr. Guerin and charge him with three counts of domestic battery. Therefore, Deputy Allen Adkins has no reason to go one way or the other in terms of his assessment of the evidence in this case or what was reported to him that day by Ms. Postas, and in fact, to the extent that he arrested Mr. Guerin, he is aware at the time that he prepares his report and conducts the investigation that he is going to be the state's, one of the state's main witnesses in a subsequent criminal case against him. So he has no axe to grind either way and is simply there to investigate. He testified that he is trained in looking for signs of corroborative evidence consistent with what the alleged victim in the case, the plaintiff, Ms. Postas, tells him happened, and he looks for such things as bruising, bumps, swelling, redness, the types of things that you expect to see if in fact what Ms. Postas testified to in fact occur. And the most important thing that he testifies to is he examines her, he looks at her, he talks to her, and he sees absolutely no physical evidence suggesting that she has been involved in any altercation of the physical nature with Mr. Guerin. Can you have a concussion without some visible sign of trauma? Possibly, except to the extent that, and in this case, interestingly, Ms. Postas did testify at the hearing and in the petition for her protection that when the door was knocked off the hinges, she had been pushed into it and caused injury to her head. So he typically then looked to and tried to visualize an injury consistent with what was reported and indicated that he would, and the only reason he didn't do that in this case is that she did not report that to him during the course of his investigation. And his investigation occurred essentially pretty much after he walked into the house and got between the two, even though there was no, I think, physical contact between the two at that point, but he got between them in case there would be, but there was a lot of yelling going on that he heard from the street. That is correct. So he didn't walk into the house where they were both sitting with their hands folded saying, how are you this evening? No, but another inconsistency is that Ms. Postas testified in the order of protection hearing that when Deputy Adkins entered the residence, she was actually on the floor with Mr. Garins standing up over top of her. In the petition for her protection, there's no mention made of her ever ending up on the floor, Mr. Garins standing up over her, and Deputy Adkins, again, with no extra grind either way, says that that is absolutely not the case. When he entered the residence, they're standing a few feet from each other, arguing verbally. Another inconsistency that calls her testimony into question. And it's inconsistent because he didn't see her there or because you're saying it never happened? I mean, what if it happened just before he had gotten there and she's in the midst of a bit of a heated contest? Then, Your Honor, we would expect to see that in the petition for order of protection as alleging what it was that the defendant did to her allegedly in this case. All she puts in that petition is that he pushed her up against a wall and picked her up, and I think she used the word, slammed her into the door, knocking the door off of the hinges. At no point does she say she ends up on the ground in that petition for order of protection. And again- Do you know whether or not she had any assistance filling out the petition for emergency order? At one point, when questioned about why she didn't include numerous items that she testified to in the hearing, there were a variety of excuses given that she just didn't get all that detail, that she was at the courthouse late in the day and had concerns about her ability to get all of that put in there. And at one point, albeit not in the hearing in this case, I believe it was suggested at one point that her attorney assisted her in filling that out. But what you have to keep in mind about that is that, given the things that she testified to that allegedly were inflicted upon her that day by Mr. Garin, two or three of the most heinous of those being pinned up against the wall with his arm up against her throat, pushing so hard that it caused pain, was never told to Deputy Atkins, was never included in the petition. With all due respect, the question was, did she have assistance filling out the petition? I believe she did. And that's based on- Based on testimony that occurred in a subsequent hearing, not before Judge Bruce that day, actually in the criminal case. But it's not part of this record? That's correct. Okay, okay. And- You know, the credibility, the trial court made a specific credibility finding as to the plaintiff and a specific credibility finding as to the defendant, correct? Yes, that's correct. I mean, I've done an exhaustive, you know, search of this, but have you ever seen any cases that a court of review has substituted its judgment for that of the trial court who heard the testimony and actually made specific credibility determination? It's not a frequent occurrence, Your Honor, and I have not seen it. But however, the standard articulated in the best case suggests that it would not be inappropriate to make such a finding if, in fact, the standard of manifest way of the evidence is suggested. You very rarely see a situation in a trial court where an alleged victim or a plaintiff in order of protection is caught deliberately misrepresenting facts to the court. But that happened in this case. Although she was not under oath, and I've argued that that- Is that the employment issue? Yes, that tends to cast a pall over all of her credibility because it demonstrates a willingness to mischaracterize the truth to the trial court in an effort to enjoin or further restrain this defendant, Mr. Garin, from being in a lawful place of public accommodation where he had every right to be. The question that the court asked her was essentially completing the plenary order of protection. Would you like your employment, place of employment included, and if so, where do you work? It's not ambiguous. It's not open to interpretation. And she clearly stated, I'm employed at Neighbors Bar and Grill. She didn't have the address off the top of her head, but her attorney came in the following day with the address, and the order was thus amended. We were not able to deal with that at the hearing because it just came up after the evidence was closed. So we went out and obtained the affidavits of the owner and the manager of Neighbors Bar and Grill to the effect that at no point had she ever worked in the past or was currently employed there. Based upon that, we filed a motion to vacate the entirety of the order, asking the judge to consider vacating everything at that point. His ruling was that he was going to allow the order to stand and strike that portion, barring Mr. Guerin from that establishment. Did he ever say anything concerning his credibility determinations that he made on the day of the hearing on the order of protection? No, Your Honor. In terms of the correction and the striking of neighbors? Correct. No. When the plaintiff attorney came in on that, it was basically agreed that that would be stricken from there because there was no reasonable basis to bar him from that establishment unless she was there first, essentially, because of the order of protection. But it was never the place of employment. Can I ask you a question, too? You just indicated that the question from the judge to her about her employment was clear and unambiguous. That was not on the record, correct? I believe the question was, Your Honor. Was there a transcript? Yes. And the question was asked. Oh, I missed it. I'm sorry. Page 139 and 140 of the transcript. Did you cite it in brief? I believe so, yes. I missed it. Well, doesn't she say that she works for cash? Yes, it's just cash. And it's not all the time, something like that. Would that maybe not impact the affidavits or the judge's thought about the affidavits or did he even know that you produced affidavits from his lawyer? Not at the time that the plenary order was honored, but it was a case that was considered. Okay. And those affidavits are clear. There's no discussion by the owner or the bar manager of her being employed in any capacity. At one point during the hearing, I think she suggested that she assisted somebody in running a dart league there, but that's not employment at the bar and grill, nor would it be a justification for barring him 100% of the time from that establishment. And it certainly is not employment. Those affidavits can be found in my appendix, pages 20 and 21, and the record is C79 and C80. That's the affidavits of Kelly of being the owner and Mary Cruz the bar manager. This blatant lie, as you argued, was presented to the court as part of your motion to vacate the plenary order of protection, correct? That's correct. And the court denied that motion. That's correct. The court was fully aware of this alleged lie, correct? Correct. And based upon that, as well as the plaintiff's essential admission that it should be vacated because she was not employed there, it was in fact vacated. Do we have a transcript of that motion to vacate hearing? I do not believe that transcript was prepared, Your Honor. It didn't exist or wasn't prepared? It wasn't prepared. It's a recording system. Electronic recording? Yes, and that was the base. You chose not to put it in the record as opposed to there was no recording or no transcript. Correct. There would have been a transcript. I just chose not to have it prepared. I felt that the record was sufficient with the affidavits and the judge's willingness to vacate that portion of the order. Before you run out of time, I do want you to ask a question about your second point, which is the affirmative defense. Your client testified that he grabbed or held or something the plaintiff in order to keep her from going in the house, but thereafter there was no physical contact. Other than when there was an attempt by him to retrieve her cell phone, she grabbed him, and that was it. But doesn't he have to admit to the physical contact that caused the basis of the – if we're talking about the physical contact in the house, and that's what the trial judge was talking about, was the physical contact in the house that he characterized as abuse, if the defendant denies all that physical contact, how do we have an affirmative defense? Well, Judge, I believe that the fact that he admits that he grabs her as she's going into the house establishes that if it is an unjustified touching, that would in and of itself be an act of domestic violence to which the defense would be entitled. I don't believe as a matter of law he's required to admit to each and every episode that she details, especially when these episodes get bigger and better each time she talks about them. I believe that what he has to do is he has to admit to an act of domestic abuse and then offer a justification, which in this case he did. You also have to keep in mind that in my questioning of him, I went through just the line item by line item. Did you push her into the door and knock it off its hinges? No. Did you pin her up by the throat with your forearm? No. Did you ever throw her to the ground? No. And there were no questions asked of him in cross-examination by the plaintiff, nor did the court inquire into anything there. So it's my position that the record is sufficient to show that he would be entitled to that defense based upon his admission that there was contact in his efforts to keep her from going into the house, grabbing her in that situation, as well as whatever transpired when he went to grab the cell phone to call the police. So those are the only two acts that the defense was raised against. In other words, the allegation regarding the phone, the allegation of what we'll call the doorstep, those acts were defended by raising defense, drawing defense of property. That's correct. That's all. All the other allegations, right or wrong, were simply denial. That's correct. And just if I can wrap up, I believe I'm out of time. Everything else that supports the defense is there. One of the few things everyone agreed on is that it was his home, he's the title owner. She was told repeatedly to leave. She chose not to leave, but instead to go around the house collecting belongings that she believed she was entitled to. As Wilson stated, that converts her into a trespasser. At the time she's going into the residence and he tells her not to go in, every time he tells her to leave and she doesn't. And those defenses are available under the Illinois Domestic Violence Act, and we believe there's sufficient evidence for the judge to have, or he should have, given greater consideration. I wasn't even allowed to question about what items were taken from the residence, which I think tends to demonstrate that the court really never gave those defenses proper attention in the case. How can I demonstrate protection of personal property lawfully in this possession if every question about what was taken from the residence, the objection to it is sustained? But the defense is only raised with respect to an event regarding her phone, or a phone. I don't want to say whose phone, a phone. So why would all, if she took everything out of the house, if he's not raising a defense to it, why is it relevant material? It's part of the defense to the unlawful entry in the first place. She is going into the residence with the intent on retrieving items that are lawfully in his possession. There's nothing in the record to suggest that he had stolen anything from her or taken anything from her. It was her intent all along at the time she unlawfully entered to go through and retrieve belongings from the residence. And there's a dispute between the two of them over whether they were her things, his things. And that was something I was not allowed to explore, which I do believe would have... But the point is, regardless of whose they were or whether she took them or not, he only raised the defense of property with respect to the phone. It was her phone that wasn't even raised as an issue of a defense. The defense to the residence and the defense of property lawfully in his possession are closely tied because the property lawfully in his possession is in the residence. The cell phone was just another incident of the kind there. Wait, but you said he admitted to grabbing her skirt at the threshold and some contact at or about the time of phone was in dispute. Correct. Why is it relevant if he took other things? Excuse me. Why would it be relevant if she took other things from the house if he did not have contact with her? The defense is for an act of conduct, an act of pushing, shoving, hitting, whatever. Because the defense of personal property lawfully in his possession, he's entitled to defend that personal property at the threshold. If she can't get into the house, so in other words, by trying to prevent her from entering the house, he is protecting the dwelling as well as the contents therein. And that would justify the grabbing and pulling of her to try to keep her from going in the house. Both defense of dwelling and defense of the personal property to the extent that she's articulated an intent to go in and take things out of the residence. Your honors, thank you for your time. And for all of these reasons, respectfully ask the court to consider vacating that order of protection or remaining to the circuit court with instructions to do so not pro tempore. Thank you. Thank you, counsel. Mr. Reyes. May it please the court. Good morning, your honors. Good morning, counsel. My name is Nathan Reyes on behalf of Ms. Jacqueline Poses. Your honor, there's one thing I think both parties do absolutely agree, and that this issue really is about credibility. And that impacts both of the points I want to discuss. First, what happened at the trial court in terms of the evidence and testimony presented. And secondly, how credibility impacts the affirmative defense of defense of dwelling. I'm not going to belabor the point about the evidence and testimony at trial. I think your honors touched upon a very salient point, which is we are not in a position here to see the testimony, to see the witnesses, to see their demeanor. The trial court was. And that is why the burden on review is so strict. It has to be against the manifest wit of the evidence. With respect, the trial court's opinion, the six pages that he dedicated to explaining why he ruled in plaintiff's favor, show very clearly that the issue came down to credibility. That he was able to examine Ms. Poses' demeanor, Mr. Guerin's demeanor, in accordance with the testimony presented by Officer Adkins. And he felt, based on preponderance of the evidence at the trial court level, that Ms. Poses' story simply had more credibility and was more likely than not to be true. Well, essentially, didn't the trial court have some problem with the fact that if there was this contact at the front door, it was unlikely that it stopped as she went through the house? Wasn't that something that he referenced? Yes, your honor. He spent quite a few pages, I believe it's page 132 or 133 of the record, explaining that he had a lot of trouble understanding the defendant's affirmative defense. He states pretty clearly that in order to accept the defense of dwelling affirmative defense, you have to buy into the following theory. That the moment Ms. Poses arrived at the home, the violence was at its highest level. There was actual physical contact between the parties. And then from that point on, it de-escalated, that there was no more physical contact. The trial court looked at that and said, well, based on the testimony I've heard from Ms. Poses, Mr. Guerin, the officer, and the various other exhibits presented at trial, that doesn't make any sense. It doesn't make any sense. And that ties into, as well, the defense of dwelling. One of the defendant's arguments is that he doesn't feel that the trial court gave adequate and due attention to the defense of dwelling argument. However, the problem with that argument is that the trial court, let's assume the trial court didn't give this one act of violence that I think both parties agree happened, due attention in regards to the criminal defense. The problem is the trial court does not accept the defendant's proposition that only one act of violence occurred. Necessarily, then, if the defendant's position is that only one act of violence occurred, and the affirmative defense accounts for that, if the trial court believes more than one act of violence occurred, logically, necessarily, that affirmative defense cannot apply to those subsequent actions. That's the credibility issue. And being here now, we would have to find that the trial court's opinion, its ruling, was against the manifestation of the evidence. And this is, in many ways, a classic he said, she said story. And the trial court only had to look at a preponderance of the evidence, burden of proof, at the trial level. The inconsistencies, as the defendant has pointed out, really come down to one of two categories. Either it wasn't in Officer Atkins' report, or it was not in the petition for an order of protection that was filed at the court. I think both are easily explained. First, I think the trial court makes very clear that an officer is not going to write down verbatim everything that happens in an event. It would be, I think, simply ridiculous to expect that a police officer could write down everything verbatim that happens with minute detail, especially in the middle of an ongoing physical confrontation. Two, Ms. Postas was pressed for time. Now, I was not the attorney at the trial level. The co-counsel was. And he assisted her very late on, I believe, a Friday to get this petition done before the weekend and the closing of the court. So necessarily, not everything is going to be in there. But that does not mean that Ms. Postas' testimony is, therefore, lacking in credibility. Counsel points out the inconsistencies. Can you point out some of the consistencies, if there are any, in the report to the officer, the verified petition for emergency order of protection, and trial testimony? Sure. First, the pictures presented at trial show bruising. Now, admittedly, the trial court saw it was slight bruising. But I believe that can be explained by the fact that the pictures were taken about eight days after the incident in question. So bruises do go away after a period of time. She reported back pain to the officer, and she testified to back pain. In addition, she, when, excuse me for a moment, counsel raised the issue of did the officer see any marks on Ms. Postas' body? Now, I've addressed this in my brief, but briefly here. First, Ms. Postas was fully clothed. So if there were any bruises or contusions or redness or swelling, they weren't going to be seen underneath her clothing. Second, the officer, while he does respond to a lot of domestic violence disputes, he's not a trained EMT. He's not a paramedic. He's not a doctor. He's not a nurse. The defendant did not provide any medical evidence at the hearing suggesting that these bruises may have been self-inflicted, that they were caused by an alternate source. Again, that goes back to the credibility. What makes more sense? These were caused by the actions on February 10th of 2009. In addition, we hear the court, or in questioning that's elicited from the defendant, he admits to the screaming and yelling occurring at the home. He admits to holding her, touching her, and at least one physical act of shoving. So we know that that occurred. And then, of course, the trial court had an opportunity to see their demeanors on the stand. Which story made the most sense? Mr. Guerin's testimony simply amounts to, I wanted her out of my home. And this leads into the defense of dwelling issue. The third district in the Wilson case noted in dicta that defense of dwelling could be raised as a defense against orders of protection. I believe we have to, and while I agree that the Domestic Violence Act does explicitly state that nothing shall bridge anything in the, quote, criminal context in terms of self-defense and so on, I think we do need to be very careful with how this is applied. In Wilson, we had a situation where a pregnant woman was confronted by the father of her soon-to-be child. The father came to the woman's house and tried to enter through the front door. The woman said no. He attempted to enter through the door, and she pushed him back out. The father in that case, in the Wilson case, is the one who brought the order of protection against the pregnant mother. And the mother was the one who brought up the defense of dwelling. Now, that issue was only addressed in dicta because there were other procedural faults that resulted in the O.P. being overturned. But the importance, I think, of that is to show the public policy behind why I believe the third district would allow the defense of dwelling in that situation. Pregnant mother, a man trying to get in through the door, she's trying to keep him out. In the instant case, Ms. Pozes' testimony, and this is on page 39 of the record, is that Mr. Guerin allowed her in the home. They had been cohabitating. Some of her possessions were in that home. So here we have a situation where Ms. Pozes, with her children, is not making an aggressive action. She's, in fact, being invited in. Mr. Guerin says, come in, take your stuff, and leave. This is, again, page 3940 of the record. If he had a defense of dwelling argument at that point, he's weighed that by allowing her in. Now, granted, he is the legal owner. I suppose at any point he could simply terminate the invitation. But then we have to go and look at the reasonableness of the action. Ms. Pozes' testimony is that while he is yelling, get out of my house, and that testimony is confirmed by Officer Adkins' testimony, she is being held against the wall and being pushed around by Mr. Guerin. If Mr. Guerin wanted her out of the house, if he wanted to use reasonable and justifiable force to get her out of the house, he would not have pushed her against the wall and restrained her from leaving. Again, it all ties back to credibility. It all ties back to the trial court being able to look at this and say, does this defense make any sense? And it does not. Again, defendant's testimony is we start at the highest point of violence, actual physical contact, and it de-escalates from there, which does not comport with Officer Adkins' testimony, coming in and seeing them face-to-face, screaming and yelling. It doesn't comport with the 9-1-1 tape that was played. That is why the defense of dwelling simply doesn't make sense. It is difficult to believe that only one act of physical violence occurred, and that's on page 133 of the record, the judge's opinion on that. In summation, Your Honors, this case really is about credibility. And I think we do need to be very careful if we're going to place this court's opinion before that of the trial court for the very simple reason that the witnesses aren't here in their entirety. We're not here to see them. We're not here to see their demeanors. We're not here to actively cross-examine or take a direct testimony. That is why we would burden this so high. And, yes, there will be inconsistencies. I don't believe you'll ever get testimony that is completely, 100 percent consistent with everyone. The problem is the defendant has to show that all these consistencies not just would possibly make you come to a different conclusion if you were in the trial court's position, but that it is so against the manifesto of the evidence that no other result could stand. And I don't believe the defendant has made that burden. What about the alleged misrepresentation at the end of the hearing? Do you want another address covered? Sure. Why? Well, first of all, you said you weren't trial counsel, but were you there at the motion to reconsider hearing? No, I was not. Was there, in fact, a hearing, to the best of your knowledge? To the best of my knowledge, I believe there was one. However, I believe it was very short because counsel for Ms. Postis, upon finding out that she was not actually employed by neighbors, agreed, no problem, we'll get that language out of the order immediately without objection. And if I may speak to that, when we look at what she said, she said it's just for cash. Based on our conversation with Ms. Postis, it was her understanding that she was being tried out for a position as a server at neighbors and that she was simply there on a trial basis to see if she could handle the workload, if she could handle the customers and do the job. But the employer or the owner and the manager or the bartender, whatever their positions were, said that she didn't work there. That doesn't say that she was on a trial basis. It doesn't say that we were interviewing her. And her own testimony was that she went to this particular bar because she liked to play pool and respondents like to play pool, but they played in a league at some other location, so she felt it was safe to go to this one. So, I mean, that really is perplexing how she's, you know, they're not admitting that they have any relationship with her of any nature. I think we need to parse the affidavits very carefully and see what they say. I agree. She was never employed by them in a legal employer employee relationship. I agree with that. However, that does not necessarily mean, it's not mutually exclusive to the fact that they may have been testing her out, frankly, under the table, seeing if, you know, let's have you work maybe just for tips, see if you can handle the load, and see if you can handle serving these customers at these various hours of the day. Now, that's her understanding of what the situation was. Clearly, to a great extent, was mistaken. How it affects her credibility at trial, though, I think is answered very clearly by the fact that at no time in her testimony did she ever say, I work at Neighbors, I feel threatened there, and therefore I want an OP. It was not until the judge himself asked, is there a place of employment you would like protected, that she thought, well, you know, it's my understanding I'm trying out for this position at Neighbors. I should get that covered too. It was not an affirmative act by her that brought this issue to light. It was rather the judge's decision and discussion about that. Can you just wrap up or give us a summary, and then your time is up. Basically, Your Honors, this issue comes down to credibility. I believe the trial court was in the best position to assess that credibility and, therefore, would ask this court to affirm the trial court's finding. Thank you. Thank you. Mr. Burr. Thank you. Your Honors can scour this record and you will not find any testimony of anyone saying that they were working under the table for cash or anything to that effect. They were presented in the motion to reconsider with the affidavits of Kelly Evink and Mary Cruz, and I was seeking to vacate the entirety of the order of protection. At no point did they ask for an evidentiary hearing where they could bring Mr. Evink in and Ms. Cruz and have them testify that she was working under the table for cash or anything to that effect. The question was specific. Where are you employed? I believe that a fair inference can be drawn from the fact that they didn't want an evidentiary hearing to bring Mr. Evink in and Ms. Cruz, because it would have shown, consistent with the affidavit, she did not ever and did not currently work there in any capacity. The thing about credibility is it's a continuum. It starts with, as was suggested by the plaintiff in their brief, differences in adjectives and verbs. Did you get hit? Did you get punched? Did you get smacked? Versus the other end of the spectrum, which is leaving things out that are very significant material or putting things in at one point that weren't put in before that are significant material. Mr. Well, Mr. Burt, if you've ever, and maybe you have children, but it's been my experience that when I catch my child in a lie, he says, well, you didn't ask me that question. You know, I would have told you, but you didn't ask me that question. Right. It's something we all deal with. Well, what if, I mean, we don't know exactly what Officer Atkins said to her when he walked in that door. We have what his report says. We also know that police officers' reports often don't include everything, although we hope they include the most important issues. So, you know, without the trial judge being there at the time of the call, how do we know that he asked the question and that she gave the answer? Or was it a stream of consciousness that she was spewing as he was trying to calm her down? Well, we know that he asked her what happened, just as the petition for protection asked her what happened. And you would think that if someone had been pinned up by the throat, been thrown to the ground to the point where the throat hurt from it, which was her testimony, you wouldn't have an officer that was never told about that. Or the bump on the back of the head. Being fully clothed doesn't prevent Officer Atkins from visualizing the redness on her throat that would be there if she, in fact, had been pinned. Or the bump on her head, had she, in fact, been injured in the back of her head. Those types of injuries were not reported to the Deputy Atkins. They were not reported to the court in the petition for order of protection. And that is significant. That's not word player semantics. That is a glaring omission that bears upon credibility. With respect to Atkins not being a doctor, you very rarely see doctors called to the scene of a domestic violence dispute. The officer's trained. He handles three or four of these a day. He knows what a bruise looks like. He knows what a contusion, swelling, bump, and certainly relies on the alleged victim to report those things to her. Had she reported them to him and showed him something he could see with his eyes, we would have had photographs that weren't eight days old. We would have had him do his job, which is to collect evidence to buttress his arrest and subsequent prosecution of Mr. Guerin. And those things are absent. And, Your Honors, it's not just semantics or word play. This was all presented to the court. It goes beyond. I agree. One of the reasons you give deference is because the trial court sees the person shifting in their seat or they see them averting their eyes. And those are the things you really can't look at and evaluate as an appellate court. But omissions and inconsistencies are things that you see in the record. Her explanation for why things weren't included are things you can see in the record. And it doesn't have the same type of credibility deference that the judge's ability to see her eyes or his eyes when he's testifying or shifting in the seat or acting uncomfortable or nervous would give. And with respect to the defense of dwelling, the only thing I want to say on that and the defense of personal property is that, as I argued in brief, those are criminal defenses recognized under the criminal code and adopted into the Domestic Violence Act. Just as you would not be deprived of that defense in a criminal case if the information says that you punched the man in the nose and your self-defense argument is, well, I actually punched him in the jaw, there's nothing to suggest that you have to admit to each and every embellished or concocted version of events that a victim or alleged victim under the Domestic Violence Act puts forth, especially when she's kind of all over the place, depending upon when you ask her. But here, didn't the respondent on question actually deny that there wasn't any other physical contact once she got into the building? He denied that each and every instance of contact that she testified to, being pinned by the throat, didn't do it, being thrown to the ground didn't do it, and knocking the door off the hinges and then putting it back up again didn't do it. He testified to the contact in the beginning as she was entering the residence unlawfully, and he did not. The testimony is not that he allowed her in. His testimony was clear, and it's corroborated by Officer Adkins and Ms. Tolsis herself, that she was told repeatedly to leave and did not do so because she believed she had a right to be there to collect whatever she wanted to collect from the residence. Again, that's not in the record. He attempted to stop her from going in, and he admitted to, if it is unjustified, what would clearly constitute an act of domestic violence, that being the grabbing and pulling her, trying to keep her from entering the residence. I believe that that's all he has to do in order to have those affirmative defenses given due consideration by the court. And for these reasons, because we believe that it is contrary to the manifest way of the evidence, and because we believe that he was not given an ample evaluation of his affirmative defenses, we respectfully request this court enter an order vacating that two-year order of protection. Thank you. Thank you, counsel, for your arguments today. We will take this matter under advisement.